**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

NICHOLAS MORGAN,                                           x          **FIRST AMENDED COMPLAINT**

    Plaintiff,                                              x          **JURY TRIAL DEMANDED**

    -against-                                               x          **09 CV 4168(ADS)(AKT)**

THE COUNTY OF NASSAU, a municipal entity;     x          **ECF CASE**
NASSAU COUNTY POLICE OFFICER
MICHAEL QUAGLIANO; NASSAU COUNTY              x
POLICE LIEUTENANT NICHOLAS
PANDOLFO, COMMANDING OFFICER,                  x
MOUNTED UNIT; NASSAU COUNTY
POLICE OFFICER CHRISTOPHER P. MAHER,           x
SHIELD NO. 1578, individually [and in their
official capacities], NASSAU COUNTY POLICE      x
DEPARTMENT CHIEF (FORMERLY
INSPECTOR) JAMES O'LEARY; NASSAU              x
COUNTY POLICE OFFICER ANDREW
CARBON, BUREAU OF SPECIAL                       x
OPERATIONS; NASSAU COUNTY POLICE
DEPARTMENT LIEUTENANT MICHAEL                   x
KELLY, BUREAU OF SPECIAL OPERATIONS;
and JOHN DOES 1-10, Nassau County Police        x
Officers, Supervisors and/or Commanders,
individually and in their official capacities,       x

    Defendants.                                             x

-----------------------------------------------------------------x

       Plaintiff NICHOLAS MORGAN, by his attorneys BELDOCK LEVINE & HOFFMAN

LLP, as and for his complaint alleges as follows, on information and belief:

## PRELIMINARY STATEMENT

1.    This is a civil rights action in which the plaintiff NICHOLAS MORGAN seeks relief for

defendants' violation, under color of state law, of his rights, privileges and immunities

secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the First, Fourth, Fifth and

Fourteenth Amendments to the United States Constitution, and the Constitution and laws

of the State of New York, on or about October 15, 2008.

2.    Defendants, THE COUNTY OF NASSAU, a municipal entity; NASSAU COUNTY

POLICE OFFICER MICHAEL QUAGLIANO; NASSAU COUNTY POLICE

LIEUTENANT NICHOLAS PANDOLFO, COMMANDING OFFICER, MOUNTED

UNIT; NASSAU COUNTY POLICE CHIEF (FORMERLY INSPECTOR) JAMES

O'LEARY; NASSAU COUNTRY POLICE LIEUTENANT KELLY, BUREAU OF

SPECIAL OPERATIONS; NASSAU COUNTY POLICE OFFICER CHRISTOPHER P.

MAHER, SHIELD NO. 1578; NASSAU COUNTY POLICE OFFICER ANDREW

CARBON; JOHN DOES 1-10, Nassau County Police Officers, Supervisors and/or

Commanders, individually, exact number which is unknown at this time, jointly and

severally, did cause plaintiff NICHOLAS MORGAN to be subject to, inter alia,

deprivation of rights of free speech, assembly and association, excessive and

unreasonable force, assault and battery, negligence, false arrest, and false imprisonment

causing him financial and serious physical and mental injury.

3.    Plaintiff seeks compensatory and punitive damages, an award of attorneys' fees and costs,

and such other and further relief as the Court deems proper.

## JURISDICTION

4.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a) (3) and (4), as this action seeks redress for the violation of plaintiff's constitutional and civil rights. Jurisdiction is also conferred by 28 U.S.C. § 1332 because as of October 2008, plaintiff was a resident of West Virginia and defendants are residents of New York, and the matter in controversy exceeds the sum or value of $75,000.

5.      Plaintiff's claim for declaratory relief is authorized by 28 §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

6.      Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over any and all state constitutional and state law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

## VENUE

7.      Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because this is the judicial district in which the events giving rise to plaintiff's claims occurred.

## JURY DEMAND

8.      Plaintiff demands trial by jury on each and every one of his claims.

## PARTIES

9.      Plaintiff NICHOLAS MORGAN ("Morgan") was at all times relevant to this complaint and when the complaint was filed a citizen of the United States and a resident of the state of West Virginia.   He is now a resident of the state of Colorado.

10.     Defendant COUNTY OF NASSAU (the "County") is a duly constituted municipal entity

created and authorized under the laws of the State of New York.   The County is

authorized by law to maintain a police department which acts as its agent in the area of

law enforcement and for which it is ultimately responsible.   The County assumes the

risks incidental to the maintenance of a police force and the employment of police

officers, including but not limited to its maintenance of a mounted unit.   At all relevant

times, the County acted through its agency, the Nassau County Police Department

("NCPD") to commit the acts alleged in this Complaint and was responsible for such acts.

11.   Defendant MICHAEL QUAGLIANO ("Quagliano") is or was, at all times relevant to this

complaint, a police officer employed by the NCPD in the Mounted Unit, a specialized

unit of the NCPD in which police officers perform many of their duties while riding

horses (the "Mounted Unit").

12.   Defendant LIEUTENANT NICHOLAS PANDOLFO ("Pandolfo") is or was at all times

relevant to this complaint, a police lieutenant employed by the NCPD and the

commanding officer for the Mounted Unit.   On October 15, 2008, Pandolfo was the

supervisor for the Mounted Unit and was personally involved in the incident because he

directed and rode with the Mounted Unit officers against the protesters, including

Morgan.

13.   Defendant CHIEF (FORMERLY INSPECTOR) JAMES O'LEARY ("O'Leary") is or was

at all times relevant to this complaint a police inspector employed by the NCPD.   On

October 15, 2008, O'Leary was the incident commander responsible for the policing of

the intersection of Hempstead Turnpike and California Avenue where Morgan was

injured and arrested.   He was personally involved in the incident because he approved

the use of the Mounted Unit against the protestors, including Morgan, and was present at

the scene during the incident.

14.     Defendant LT. MICHAEL KELLY ("Kelly") is or was, at all times relevant to this

complaint, a lieutenant of the NCPD, assigned to the BSO.   Defendant Kelly was

personally involved in the incident because he directed the arrest of protestors, which

included Morgan.

15.     Defendant CHRISTOPHER P. MAHER, Shield No. 1578 ("Maher"), is or was, at all

times relevant to this complaint, a police officer employed by the NCPD.   Defendant

Maher was one of the officers who falsely arrested Morgan.

16.     Defendant ANDREW CARBON ("Carbon") is or was, at all times relevant to this

complaint a police officer employed by the NCPD and assigned to the Bureau of Special

Operations ("BSO").     Defendant Carbon was personally involved in the incident

because he was one of the NCPD officers who seized Morgan and falsely arrested him.

17.     Defendants JOHN DOES, are, or were at all times relevant to this complaint, NCPD

police officers, supervisors, and/or commanders.   These JOHN DOE defendants include

individuals who assisted and/or conspired to and/or acted in concert and/or did engage in

the violations of plaintiff's rights described herein, or who failed to protect the plaintiff

from violations of his constitutional rights.   The JOHN DOE defendants include

individuals responsible for the training, supervising and command of the Mounted Unit.

18.     Defendants NASSAU COUNTY POLICE OFFICER MICHAEL QUAGLIANO;

NASSAU COUNTY POLICE LIEUTENANT NICHOLAS PANDOLFO,

COMMANDING OFFICER, MOUNTED UNIT; NASSAU COUNTY POLICE CHIEF

(FORMERLY INSPECTOR) JAMES O'LEARY; NASSAU COUNTRY POLICE

LIEUTENANT KELLY, BUREAU OF SPECIAL OPERATIONS; NASSAU COUNTY

POLICE OFFICER CHRISTOPHER P. MAHER, SHIELD NO. 1578; NASSAU

COUNTY POLICE OFFICER ANDREW CARBON; JOHN DOES 1-10, Nassau County

Police Officers, Supervisors and/or Commanders, individually, (collectively, "the

individual defendants") are, or at all times relevant to the complaint, were, employees,

agents, servants, and/or officers of defendant COUNTY OF NASSAU and the NCPD.

19.    At all times relevant herein, each of the individual defendants acted under color of law in

the course and scope of his or her duties and functions as an agent, employee, servant

and/or officer of the County and/or NCPD in engaging in the conduct described herein.

20.    At all times relevant herein, the individual defendants have acted for and on behalf of the

County and/or the NCPD, and incidental to the lawful pursuit of their duties as officers,

agents, employees, and/or servants of the County and NCPD.

21.    At all times relevant herein, the individual defendants violated clearly established

constitutional standards under the First, Fourth, Fifth and Fourteenth Amendments of the

United States Constitution and the Constitution of the State of New York which a

reasonable police officer and/or public official under his or her respective circumstances

would have known.

## COMPLIANCE WITH GENERAL MUNICIPAL LAW

22.    Plaintiff served a notice of claim upon defendant County within 90 days of the events

giving rise to plaintiff's claims and have otherwise complied with the statutory

requirements of the General Municipal Law of the State of New York.

23.    Although more than 30 days have elapsed since service of the notices of claim, defendant

County has failed and/or neglected to adjust or pay such claims.

24.     This action was filed within a year and 90 days of the events giving rise to the plaintiff's claims.

## STATEMENT OF FACTS

25.     Nicholas Morgan was born in 1983 and raised in West Virginia.   Before he had even graduated from high school, Morgan enlisted as a reservist with the United States Army. In November 2003, he received active duty orders and was deployed to active duty in December 2003.

26.     Between February 2004 and February 2005, Morgan served with the United States military in Baghdad, Iraq, as a heavy construction equipment operator.

27.     In July 2006, Morgan was discharged from the U.S. Army Reserves.

28.     In October 2008, Morgan was 24 years old.   He was a member of a group called the Iraq Veterans Against the War ("IVAW").   IVAW is a group of current and former servicemen who oppose the U.S. military action in Iraq.

29.     On October 15, 2008, Hofstra University ("Hofstra University") in Hempstead, Nassau County, New York hosted the third televised presidential debate in which then-Senator Obama and Senator McCain participated.

30.     Coordination and planning for the security for that event occurred at the highest levels of Nassau County leadership in connection with other agencies.   Participants in the security planning for the Hofstra University debate included Karen O'Callaghan, the Chief of Patrol for the NCPD; James Callahan, Commissioner for the Nassau County Office of Emergency Management; John O'Malley, the Assistant Director of Safety for Hofstra University, and Joseph Muscatello, Special Agent, United States Secret Service.

31.     Chief of Patrol O'Callaghan actively participated in the planning for the security provided

by the NCPD at the October 15, 2008 presidential debate at Hofstra University.   In that

capacity, she developed, approved and promulgated the NCPD's security plan for the

debate.   For purposes of this event and other major security events in Nassau County,

Chief of Patrol O'Callaghan was a policy maker for the County in 2008.

32.   Chief of Patrol O'Callaghan exercised her authority with the knowledge and/or approval

of the Commissioner of Police Lawrence W. Mulvey.   Commissioner Mulvey was, at all

times relevant to this complaint, Commissioner of the NCPD and a final policy maker for

purposes of the NCPD's policies, practices and customs.

33.   The policies, practices and customs of the NCPD include those that govern the Mounted

Unit of the NCPD, and the security plan for the October 15, 2008 presidential debate

hosted at Hofstra University.

34.   Planning for the October 2008 presidential debate at Hofstra University took

approximately a year of coordination among government agencies, including the NCPD.

35.   The use and deployment of the NCPD Mounted Unit was one aspect of the NCPD's

presidential debate security plan.   That plan also included the use of riot clad officers

from NCPD's Bureau of Special Operations ("BSO").

36.   On October 15, 2008, IVAW organized a peaceful demonstration outside of the entrance

gates to Hofstra University.   The entrance gates are located on Hempstead Turnpike and

access from California Avenue.   Members of other organizations participated.

37.   One purpose of the demonstration was to have a member of IVAW pose a question to

each of the presidential candidates.   In addition, CBS, which moderated the debate, had

been informed by letter of IVAW's request that the questions be asked of the participating

candidates, and of some demonstrators' intention to commit civil disobedience if the

questions were not going to be asked of the candidates.

38.     Prior to the IVAW demonstration, at least two demonstration organizers had met with and advised NCPD police officers about the plan for nonviolent civil disobedience; they had assured NCPD police that the demonstrators intended to cooperate with the police.   To that end, IVAW organizers of the demonstration informed the NCPD and some of its police officers, including Detectives Thomas Calvert and Robert Annese, of this purpose prior to the demonstration.

39.     During the evening of October 15, 2008, Morgan attended the IVAW demonstration near the entrance of Hofstra University with several friends and acquaintances.   It was not his intent to engage in, nor did he engage in, any form of civil disobedience prior to his being assaulted by the defendants.

40.     Many demonstrators attended the demonstration, most of whom were not veterans or members of IVAW.

41.     Morgan, a US Army veteran, wore at the demonstration a desert camouflage uniform issued by the United States Army.

42.     The area outside the main gate of Hofstra University near Hempstead Turnpike and California Avenue was policed by officers of the NCPD.   Defendant O'Leary was the commander in charge of policing outside the gates of Hofstra University.   Some NCPD officers were on foot, while other NCPD officers were mounted on police horses. Some NCPD police officers wore riot gear.

43.     On October 15, 2008, defendant Kelly was assigned to supervise the Crisis Mitigation Team.   The primary purpose of the team was crowd control and to stop demonstrators from entering the debate site.   That evening, defendant Kelly requested the presence of

the Mounted Unit at the main gate to Hofstra University.   The Mounted Unit was initially positioned in line formation in front of the main gate of Hofstra University on the north side of Hempstead Turnpike.   BSO officers, many of whom wore riot gear, were positioned behind the Mounted Unit.

44.   Defendant Pandolfo was the commanding officer of the Mounted Unit.   At some point while the Mounted Unit was in a line outside of the main gate, he directed defendant Quagliano to move to the end of the line of horses, which he did.

45.   Protestors outside of the debate at the intersection of California Avenue and Hempstead Turnpike made a variety of political statements relating to the debate.   Many protestors carried American flags.   Many protestors wore U.S. military clothing.   Some protestors carried posters with political slogans.

46.   During the demonstration, at approximately 7 p.m., as planned, some veterans dressed in military uniforms and carrying the American flag committed civil disobedience by approaching a police line directly in front of the main entrance to Hofstra University on Hempstead Turnpike and requesting permission to pass through so they could deliver questions to the candidates.   Many members of the crowd were permitted by the defendants and other police officers to cross from the north side of Hempstead Turnpike to the south side to support the veterans who were intending to engage in civil disobedience.

47.   Upon being refused entrance, some of these veterans submitted peacefully to arrest by uniformed NCPD police officers.   The veterans who attempted to enter Hofstra University did not resist arrest.

48.   Morgan was not among the veterans who were initially arrested.   He did not engage, nor

was it ever his intent to engage, in any form of civil disobedience at any time that evening, before or during the demonstration.   During the demonstration, Morgan never unlawfully crossed, nor did he attempt to cross, any barriers or barricades set up or formed by the NCPD.

49.   Following the peaceful acts of civil disobedience by certain members of IVAW (in which Morgan did not participate), without first announcing to the crowd that the assembly should disperse under threat of arrest, the NCPD began to forcefully and aggressively move the demonstrators away from the main entrance to Hofstra University.    Defendant O'Leary approved defendant Pandolfo's use of the Mounted Unit to move the demonstrators across from the north side of Hempstead Turnpike to the south side of Hempstead Turnpike near the intersection of Hempstead Turnpike and California Avenue.

50.   Defendant Pandolfo ordered the Mounted Unit to move the demonstrators across the street by moving the horses up to and against the demonstrators.

51.   As defendant Pandolfo was riding with the Mounted Unit, he also rode his horse against the demonstrators.   Other members of the Mounted Unit, including defendant Quagliano, did so as well.   Pandolfo continued to give orders to the Mounted Unit as they proceeded to push the demonstrators from the north side to the south side of Hempstead Turnpike.

52.   As the Mounted Unit moved forward, BSO officers walked behind the Mounted Unit.

53.   At the time the Mounted Unit began to move against the demonstrators, including Morgan, the demonstrators were not blocking pedestrian or vehicular traffic.   At that time, Hempstead Turnpike and California Avenue were closed to regular traffic. Moreover, the demonstrators had been permitted to assemble in front of the front gage of

Hofstra in support of those veterans who were going to engage in civil disobedience.

54. The efforts of the NCPD defendants to move the demonstrators from the north side of Hempstead Turnpike to the south side of Hempstead Turnpike took in excess of fifteen minutes.   During that time, defendants O'Leary, Pandolfo and Kelly witnessed the overly aggressive and dangerous actions and conduct of the members of the Mounted Unit and BSOs but took no steps to stop or prevent such actions.   They had both the time and the opportunity to stop these unlawful NCPD actions but did not do so.

55. Demonstrators were forced by NCPD police officers' orders and actions to move backwards onto a sidewalk area on the south side of Hempstead Turnpike.   The sidewalk area, particularly at the southwest corner of Hempstead Turnpike and California Avenue, was too crowded and narrow for all of the demonstrators to move into or stand safely, which was or should have been clear to the defendants O'Leary, Pandolfo and others giving orders to move the crowd back onto the sidewalk area.   On the south corners of the intersection of Hempstead Turnpike and California Avenue there were buildings, walls and plantings that limited the movement of the demonstrators.

56. At no time did the defendants or any NCPD officer order the demonstrators to disperse. All that was said by the NCPD officers was to "move back" or "get on the sidewalk" or words to that effect.

57. The plaintiff and other demonstrators complied with these orders.

58. At the direction of one or more NCPD police commanders at the scene, including but not limited to defendants O'Leary, Pandolfo and Kelly, both BSO officers and Mounted Unit officers moved forcefully against the demonstrators.

59. Defendant Pandolfo ordered the Mounted Unit officers to divide the demonstrators into

two groups and move against them to the east and west corners of California Avenue. Notwithstanding their compliance, and without any provocation or emergency situation, BSO officers and Mounted Unit officers moved into the demonstrators on the southwest corner of Hempstead Turnpike and California Avenue.

60.    Among the aggressive actions taken by the NCPD Mounted Unit police officers was to spin their mounts into the assembled demonstrators.   The NCPD Mounted Unit horses were improperly used as weapons against the demonstrators, riding into the crowd and backing off, and standing right in front of the demonstrators with no room between the horses and the demonstrators.   NCPD Mounted Unit officers used their horses to hit demonstrators.   When the NCPD Mounted Unit officers took these actions, defendant Pandolfo was riding his mount along with the other Mounted Unit officers.   Defendants O'Leary and Kelly were in physical proximity and were observing the aggressive NCPD behavior. At no time did any of these supervisors order the Mounted Unit officers to cease their overly aggressive behavior.

61.    Morgan was at the front of a group of lawful demonstrators with other veterans on the sidewalk.   While he was on the sidewalk, officers from the Mounted Unit, including defendant Quagliano, were spinning their horses into the crowd and backing their horses into the crowd.   At or about this time, defendant Pandolfo was giving orders to the Mounted Unit officers.   Defendant Pandolfo also rode his horse against the crowd.   The horse ridden by Quagliano was swinging its head and hit Morgan.

62.    Other Mounted Unit officers rode their horses face-forward into the crowd.

63.    Defendant Kelly informed defendant Pandolfo and discussed with him his intention to have BSO officers arrest demonstrators.   At some point, BSO officers, at the direction of

defendant Kelly, moved to arrest some demonstrators, although the demonstrators had not and were not engaged in unlawful activity.   Neither defendant O'Leary nor defendant Pandolfo countermanded defendant Kelly's order.   The order to arrest was not lawful because the protestors had not engaged and did not engage in unlawful conduct, including when they were on the southwest corner of Hempstead Turnpike and California Avenue.

64.   While the plaintiff was standing on the sidewalk, he saw NCPD police officers grab Geoff Millard, a demonstrator, without justification or cause, pull him off the sidewalk, and drag him into the street.

65.   Shortly thereafter, Morgan himself was knocked or pushed to the ground by one of more NCPD officers.   At the point he was knocked to the ground, Morgan was standing on the sidewalk, not blocking vehicular traffic, and complying with all police orders that had been given by the defendants.   At or about the time that Morgan fell to the ground, BSO officers, including defendant Carbon, attempted to arrest some protestors without probable cause.   Defendant Carbon's actions, including the unlawful use of force to affect an unlawful arrest, likely contributed to Morgan's fall to the ground.

66.   Once Morgan fell to the ground, demonstrators in the crowd shouted to the police that they had knocked someone down and hurt him.

67.   In addition to the BSO officers going into the crowd to make arrests, members of the Mounted Unit including defendants Quagliano and Pandolfo, recklessly and deliberately rode their horses onto the sidewalk into the crowd, and moved the horses against the demonstrators.

68.   In addition to Morgan, other demonstrators and even one NCPD officer on foot suffered injuries as a result of the excessive and unreasonable force by the defendants, including

being physically injured by the horses.

69.     The actions taken by defendant Quagliano and other members of the Mounted Unit were unreasonable, unnecessary and unjustified under the circumstances.   At the time, Morgan and other demonstrators were injured, they were complying with all lawful orders to be on the sidewalk.

70.     While he was on the ground, the horse ridden by defendant Quagliano stepped on or kicked the head of Morgan, causing him severe and lasting permanent injury.   Others were also injured by the Mounted Unit horses, including at least one NCPD officer on foot.

71.     NCPD officers, including defendant John Doe supervisors ands defendant Pandolfo, Kelly, and O'Leary were in a position to prevent Quagliano's assault on the plaintiff but failed to take any action to do so.

72.     After being trampled by defendant Quagliano's horse, Morgan lay unconscious on the ground bleeding from the head injuries he suffered.

73.     The seriousness of Morgan's injuries was or should have been evident to NCPD officers because he was unconscious and bleeding.

74.     Despite Morgan being in this condition, the defendants, including the defendants Carbon and John Doe police officers, did not provide Morgan with immediate medical care and attempted to prevent other demonstrators from providing medical assistance to Morgan.

75.     At some point, defendant Carbon and two or more NCPD John Doe police officers dragged Morgan across the street.   He was bleeding from his head.   At some point Morgan was also handcuffed by NCPD officers.   Defendants Carbon and other NCPD John Doe police officers unlawfully seized Morgan and brought him to an ambulance and

then an arrest bus, where other arrestees were being held

76.    These actions of the NCPD, including defendants O'Leary, Pandolfo, Kelly and Quagliano, were taken deliberately and intentionally.   These defendants were all present at or in immediate proximity to the southwest corner of the intersection of Hempstead Turnpike and California Avenue where Morgan was injured and at the time he was injured.

77.    Seeing the condition of Morgan, some of the arrestees on the bus demanded that NCPD police officers provide Morgan with medical attention.

78.    While on the bus, Morgan was disoriented because of his head injury and unable to clearly ask for medical assistance.   When demonstrator arrestees asked for medical assistance for Morgan who appeared unable to speak for himself, one officer stated "too bad."

79.    One of the Nassau County police officer John Does falsely told the demonstrator arrestees that Morgan had refused medical attention.

80.    While the demonstrator arrestees were on the bus, NCPD officers called them idiots and "whiners."

81.    Shortly thereafter, defendant Maher asked Morgan if he wanted to go to the hospital and he responded affirmatively.

82.    Morgan was then removed from the bus where he had been taken following his arrest and transported by NCPD officers, including defendant Maher, to the Nassau University Medical Center ("NUMC").   While at the NUMC, Morgan was handcuffed to a bed. An NCPD officer remained with Morgan while he was at the hospital.

83.    At the hospital, Morgan received stitches on his face.   His ribs and head, bruised and

swollen, were scanned.   Amoxicillin and Motrin were prescribed for his injuries.   An

appointment with the oral-maxilo-facial surgery department was scheduled for a

subsequent date.

84.   Following the receipt of this medical treatment, Morgan was taken by NCPD police

officers, including defendant Maher, to a Nassau County police station.   At the police

station, Morgan was handcuffed for several hours to a bench.   Other demonstration

arrestees were also chained to benches at the precinct.

85.   Other police officers told the arrestees that their nonviolent protest was "retarded."

When Morgan was brought into the stationhouse, at least one police officer told the

arrestees that the arrestees were responsible for the injuries to Morgan's face.

86.   While in the precinct, Morgan was harassed, mocked and taunted by NCPD officers.

Other demonstration arrestees were also harassed, mocked and taunted by officers.   For

example, NCPD police officers told Morgan and other arrestees that they were "cowards"

and "traitors".

87.   At some point, defendant Maher completed a desk appearance ticket ("DAT") for

Morgan.   The DAT stated that it was issued at 19:20 on October 15, 2008. The DAT

falsely stated that at 7:20 p.m. at California Avenue and Hempstead Turnpike, Morgan

had "walked around a police barricade into a vehicular traffic lane and ignore [sic] police

orders to return to the pedestrian side of the barricade causing a hazardous condition."

This entire statement was false and known to be so by Maher and the officers who were

consulted concerning the charges to be brought against Morgan.   Moreover, Maher wore

to these allegations without any personal knowledge of the facts and circumstances of

Morgan's arrest.

88.   Morgan was eventually given a DAT with an appearance date for November 10, 2008. He was released from NCPD custody at approximately 2 a.m. on October 16, 2008.

89.   Approximately ten veterans and five civilians at the demonstration were arrested and detained by the NCPD during the course of the IVAW demonstration.

90.   On or about November 10, 2008, Morgan and the other persons arrested at the October 15, 2008 demonstration appeared at the Nassau County Criminal Court for their court appearances.    Morgan was charged with and arraigned on disorderly conduct.

91.   All the charges against Morgan and the other demonstrator arrestees were later dismissed.

92.   As a direct and proximate result of the defendants' actions, Morgan was prevented from fully participating in the demonstration on October 15, 2008.

93.   At no time did Morgan engage in any criminal activity, disobey and lawful order of the police or engage in any other conduct which would have justified the physical force used against him and others or justified the arrest, detention and imprisonment of Morgan.

94.   As a direct and proximate result of the conduct of the municipal defendant and the individual defendants Quagliano, Pandolfo, Kelly and O'Leary on October 15, 2008, Morgan suffered severe and permanent physical injuries including, inter alia, his cheekbone was crushed, his lower orbital was shattered, his nose was broken, he had a large knot on the back of his head, and he was severely bruised, particularly near his ribs, as well as emotional distress and mental anguish.

95.   At no time did Morgan obstruct any police function, resist arrest or engage in any conduct that could reasonably be construed as endangering or threatening any police officer or other individual.

96.   The use of force by defendants Quagliano and Carbon against Morgan, with the explicit

and/or implicit approval and permission of defendants Kelly, O'Leary and Pandolfo, was objectively unreasonable in light of the circumstances then and there prevailing, and as such constituted excessive force against plaintiff's person, causing him injury.

97.   Neither emergency nor exigent circumstances requiring the use of force existed with regard to Morgan at the demonstration.   There were no serious or legitimate emergency threats requiring the use of excessive force against Morgan or other protestors during the debate protest, or giving rise to probable cause to arrest Morgan.

98.   Defendants O'Leary, Pandolfo and Quagliano failed to employ lawful techniques and apply generally accepted police practices for the use of Mounted Unit horses at a demonstration.   In particular, defendants O'Leary, Pandolfo and Quagliano knew or should have known absent exigent circumstances or an emergency, Mounted Unit horses could not lawfully be used against demonstrators as instruments of crowd control or force, yet they nonetheless unlawfully authorized and used the horses as a weapon against Morgan, injured him, and failed to stop his unlawful arrest.

99.   Defendants O'Leary, Pandolfo and Quagliano knew or should have known that it was unconstitutional and unlawful to use Quagliano's mount as a weapon to exert force against demonstrators participating in public demonstrations as a means to suppress the demonstration and exert unlawful control over the demonstrators, even when there are no exigent circumstances or an emergency.   Nonetheless, defendant Quagliano, with the permission and/or approval of defendants Pandolfo and O'Leary, used his mount as a weapon to exert force against Morgan and others to deter them from participating in the

19

demonstration and criticizing police conduct although no emergency or exigent circumstances existed.

100.   Neither defendant Quagliano nor any other NCPD officer gave any lawful order to Morgan to disperse.

101.   Defendants O'Leary, Pandolfo and Kelly failed to halt the unlawful conduct of other NCPD officers against Morgan.

102.   On information and belief, one reason for the NCPD's actions against the demonstrators, including Morgan, was to disrupt the protest and deprive the demonstrators, including Morgan, of their rights of free speech, association and assembly at an event of national political importance regarding a war that was central to U.S. foreign policy, less than a month before the presidential election was to be held.

103.   Subsequent to the events of October 15, 2008, Morgan received additional medical care for injuries because of defendants' action and inactions.   He attended several medical appointments and treatments, including but not limited to surgery to repair his orbital cavity and courses of antibiotics.

104.   As a direct and proximate result of the conduct of the defendants, jointly and severally, on October 15, 2008, Morgan has suffered financial losses and incurred financial expenses.

105.   Morgan continues to receive medical care and suffers adverse medical consequences related to the events of October 15, 2008, including blurry vision, an oozing eye and facial pain.

106.   In response to questions from the media, Lieutenant Kevin Smith of the NCPD's Public Information Office claimed that the NCPD officers at the demonstration responded appropriately, and that "one of the defendants collided with a police horse. . . . c'mon,

who do you think is gonna win?"

107.   As a direct and proximate result of the actions and conduct of the defendants described above, plaintiff Morgan suffered the deprivation of his federal and state constitutional rights and state law rights; physical and psychological injuries; pain and suffering; emotional distress; damage to reputation; loss and damage to certain personal property; and medical and legal expenses.

108.   Generally accepted police practices based on federal and state statutes and constitutions regulate the use of force and prohibit the use of excessive force.   Defendants' conduct violated generally accepted police practices.

109.   According to the International Association of Chiefs of Police, Civil Disturbances, Model Policy (2005), "The department's use-of-force policy is equally applicable to enforcement actions in the context of both mass demonstrations and civil disturbances.   That is, officers may use only such force as reasonably appears necessary to protect themselves or others from physical harm, to restrain or subdue a resistant individual, or to bring an unlawful situation safely and effectively under control."   Item B.1.   The Model Policy also provides: "Unity of action and command and control are key to effective handling of demonstrations and civil disturbances. Thus, unless exigent circumstances require immediate action, officers shall not independently make arrests or employ force without command authorization.   In exigent circumstances, supervisors shall independently authorize the use of force or such other tactics in accordance with the agency use of force policy and this policy." Item B.2.

110.   According to the International Association of Chiefs of Police, Reporting Use of Force, Model Policy (1997), the use of force includes the use of police horses to compel

compliance.

111.   The policies and practices of the NCPD at the Hofstra University demonstration violated generally accepted police policies and practices with regard to the use of force, use of the Mounted Unit, and procedures for policing demonstrations.

112.   NCPD officers, including but not limited to defendant Quagliano, were improperly trained and supervised on the proper use of horses at demonstrations.   NCPD officers, including but not limited to defendant Carbon, were improperly trained as supervised as to when and how it was lawful to affect an arrest against a lawful demonstrator not engaging in unlawful conduct.

## FIRST CAUSE OF ACTION

(Constitutional Violations - 42 U.S.C. § 1983)

113.   Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

114.   Defendants, under color of state law, subjected plaintiff to the foregoing acts and omissions without due process of law and in violation of 42 U.S.C. §1983, thereby depriving plaintiff of his rights, privileges and immunities secured by the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights:

a.      freedom to engage in protected speech;

b.      freedom of assembly;

c.      freedom of association;

d.      freedom to petition for redress of grievances;

e.      freedom from unreasonable seizure of his person, including excessive force;

f.      freedom from arrest without probable cause;

g.      freedom from false imprisonment, that being wrongful detention without good

faith, reasonable suspicion or legal justification, and of which wrongful detention

plaintiff was aware and to which plaintiff did not consent;

h.      freedom from abuse of process; and

i.      freedom from deprivation of liberty without due process of law.

115.    As a direct and proximate result of defendants' deprivation of plaintiff's constitutional

rights the plaintiff Nicholas Morgan suffered damages herein before alleged.

## SECOND CAUSE OF ACTION

### (Failure to Intervene - 42 U.S.C. § 1983)

116.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing

paragraphs as if fully set forth herein.

117.    At the time of the incidents in question in this lawsuit, members of the NCPD had an

affirmative duty to assess the constitutionality of interactions between their fellow

members of service and civilians, and to intervene where they observe another member of

the NCPD employing unjustified and excessive force against a civilian or falsely arresting

a civilian.

118.    Defendants O'Leary, Pandolfo, Quagliano, Maher, Kelly and John Does were present on

the evening of October 15, 2008 at or near California Avenue and Hempstead Turnpike

and witnessed the following wrongful actions by defendants, all of whom unlawfully

interfered with Morgan's exercise of his First Amendment and other rights and further:

By QUAGLIANO:

a.      Used his horse as a weapon against the demonstrators, including Morgan;

b. Failed to assist Morgan after his horse struck and trampled him;

c. By PANDOLFO, the Mounted Unit incident commander:

d. Gave orders to NCPD Mounted Unit to use horses against the demonstrators, including Morgan without due supervision;

e. Gave orders to Quagliano to use his horse against Morgan without due supervision;

f. Failed to give an order to the Mounted Unit to cease and desist when it became obvious that the use of the Mounted Unit was causing a dangerous situation where it was likely that some would get injured;

g. Failed to assist Morgan after Quagliano's horse struck and trampled him;

By KELLY:

a. Falsely directed the arrest, seizure and detention of demonstrators without probable cause, leading to the seizure and arrest of Morganl;

b. Failed to give an order to the Mounted Unit to cease and desist when it became obvious that the use of the Mounted Unit was causing a dangerous situation where it was likely that some would get injured;

By CARBON:

a. Falsely seized, detained and/or arrested Morgan without probable cause.

By JOHN DOES police officers:

a. Interfered with efforts of demonstrators to provide Morgan with medical assistance;

b. Used excessive and unreasonable force against Morgan and other demonstrators;

By MAHER:

a.    Falsely arrested Morgan without probable cause;

b.    Falsely detained Morgan without probable cause or justification.

119.    On information and belief, defendants Quagliano's, Carbon's and John Doe's use of force against demonstrators, including Morgan, was unreasonable, excessive and unjustified under the circumstances yet defendants failed to take any action or make any effort to intervene, halt or protect plaintiff from being physically brutalized by the Mounted Unit officers, including defendant Quagliano, at defendant Pandolfo's instruction, and by defendant Carbon, even though they had sufficient time to do so.

120.    Defendant Carbon's seizure and Maher's arrest of plaintiff Morgan was clearly without probable cause or other legal justification and in retaliation for his having participated in the demonstration, and protested the American military engagement in Iraq, yet defendants including defendants O'Leary, Pandolfo and Kelly, failed to take any action or make any effort to intervene, halt or protect plaintiff from being unlawfully and wrongfully arrested.

121.    The violation by defendants, including defendants Pandolfo, Kelly, Quigliaano and O'Leary, of plaintiff's constitutional rights by failing to intervene in defendants Quagliano's, Carbon's and John Does' clearly unconstitutional use of force and Maher's unconstitutional arrest of plaintiff resulted in the injuries and damages set forth above.

## THIRD CAUSE OF ACTION

(Individual Supervisory Liability - 42 U.S.C. § 1983)

122.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

123.    Individual defendants O'Leary, Pandolfo, Kelly and Supervisor John Does were, at all relevant times, supervisory personnel in the NCPD, with oversight responsibility for the training, instruction and supervision of the named and unnamed individual police officer defendants, including but not limited to defendants Quagliano and Carbon, who deprived plaintiff of his federal constitutional rights.

124.    The individual supervisory defendants, including defendant O'Leary, knew or should have known that the named and unnamed individual police officer defendants and defendant Pandolfo failed to intervene in defendant Quagliano's use of clearly excessive force against plaintiff and in their deprivation of Morgan's rights, including his First Amendment rights.

125.    The individual supervisory defendants O'Leary, Kelly and Pandolfo knew or should have known that the defendants Carbon and Maher unlawfully seized and/or arrested Morgan, and deprived him of his rights.

126.    Defendant Pandolfo, as the commanding officer of the NCPD Mounted Unit, failed to train, instruct and supervise NCPD Mounted Unit officers regarding lawful techniques for the use of Mounted Unit horses.   In particular, defendant Pandolfo failed to train NCPD Mounted Unit officers that absent exigent circumstances or an emergency, Mounted Unit horses could not lawfully be used against demonstrators as instruments of crowd control or force. Defendant Pandolfo gave Mounted Unit officers, including defendant Quagliano, unlawful direction as to the use of their mounts at the October 15, 2008 demonstration.

127.    Defendants O'Leary, Kelly, Pandolfo and others as yet unknown supervisors were present at the scene on October 15, 2008 and were personally responsible for the deployment of

the unit and for ensuring that the Mounted Unit carried out its responsibilities in accordance with the law and generally accepted police practices.   The Mounted Unit failed to do so at the October 15th event, and instead inappropriately used its mounts as weapons against demonstrators, including Morgan.

128.   These defendants also failed to halt the approach of the Mounted Unit against the demonstrators, including Morgan and other demonstrators, despite having sufficient time and opportunity to act.   Defendant Pandolfo rode with and was the immediate commander the Mounted Unit officers who committed these wrongful acts.   Defendants O'Leary and Kelly were in close proximity to these events and had sufficient time and opportunity to prevent the events that took place with regard to the plaintiff on October 15, 2008, but took no action to do so, despite having sufficient time and opportunity to do so.   These supervisory officers were thus personally involved in the events of October 15 2008, which caused Morgan's injuries.

129.   The supervising officers defendants Kelly and Pandolfo were also involved in the decision to arrest Morgan although he had not engaged in any unlawful activities.   They approved and failed to stop the unlawful arrest of Morgan, and thus were personally involved in the events of October 15, 2008 which caused his injuries.

130.   The individual supervisor defendants knew or should have known that the named and/or unnamed individual police officer defendants Maher and Carbon was conducting an unreasonable and retaliatory seizure and false arrest of plaintiff Morgan, depriving him of his due process of law.

131.   The individual supervisor defendants were personally involved in either ordering, or failing to take preventative and remedial measures to guard against, plaintiff's

constitutional deprivations.   The supervisory defendants knew, or in the exercise of due diligence, should have known that the actions taken against plaintiff by the named and unnamed individual police officer defendants was likely to occur.

132.   The failure of the individual supervisor defendants to train, supervise and/or discipline the named and unnamed individual police officer defendants with respect to the constitutional rights of civilians amounted to deliberate indifference or intentional misconduct which directly and proximately caused the injuries and damages to plaintiff set forth above.

## FOURTH CAUSE OF ACTION

### (Monell Claim - 42 U.S.C. § 1983)

133.   Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

134.   All of the acts and omissions by the defendants Kelly, O'Leary, Pandolfo and Quagliano and unnamed individual police officer defendants John Does described above with regard to excessive force by the use of the Mounted Unit horses were carried out pursuant to overlapping policies and practices of the County of Nassau which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant County and its agency, the NCPD.

135.   Defendant County and the NCPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

136.   The actions of the individual police defendants O'Leary, Pandolfo, Kelly, Quagliano and John Does resulted from and were taken pursuant to the de facto policies and/or well-settled and widespread customs and practices of the County, which are implemented by members of the NCPD and determined by defendants who were final policymakers with regard to the use of force and policing of demonstrations.   The relevant policies, customs and practices with regard to the use of excessive force against Morgan are that NCPD Mounted Units police officers and their horses are permitted to be used as weapons to exert force against demonstrators participating in public demonstrations as a means to suppress the demonstration and exert unlawful control over the demonstrators, even when there are no exigent circumstances or an emergency.   The use of police horses against participants in a lawful demonstration when no emergency or exigent circumstances exist is per se unconstitutional.

137.   The NCPD, with the knowledge, approval and encouragement of Commissioner of Police Mulvey, Chief of Patrol O'Callaghan, O'Leary failed to properly train and supervise officers concerning the First Amendment rights of demonstrators to express their political opinions and to observe and protest police misconduct without suffering retaliatory use of force by NCPD Mounted Unit officers such as defendants Quagliano, O'Leary and Kelly. As such, final policymakers approved these actions of the NCPD.

138.   The existence of the foregoing unlawful de facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NCPD and the County, including, without limitation Commissioner of Police Mulvey, Chief of Patrol O'Callaghan and defendants Pandolfo, O'Leary and Kelly.

139.    Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NCPD and the County, including Commissioner of Police Mulvey, Chief of Patrol O'Callaghan and defendants Pandolfo, O'Leary and Kelly, have not taken steps to terminate these policies, practices and/or customs, and do not properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in Nassau County.

140.    The use of the Mounted Unit as part of the security deployed by Nassau County at Hofstra University on October 15, 2008 was approved by senior policymakers, including Chief of Patrol O'Callaghan and Commissioner of Police Mulvey.   The determination to use the Mounted Unit at the location involved a review and approval of the deficient policies and practices of the Mounted Unit.   The incorporation of the Mounted Unit into the plans for the debate security was a ratification of the defective training, policies, practices and procedures of the Mounted Unit despite the intense review and preparation involved in establishing, coordinating and deploying NCPD personnel at the October 15, 2008 demonstration.

141.    The aforementioned County policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers within the NCPD Mounted Unit are evidenced by the NCPD police misconduct detailed herein.

142.    The plaintiff's injuries were a direct and proximate result of the defendant County and its agency, the NCPD's, wrongful de facto policies and/or well-settled and widespread

customs and practices and of the knowing and repeated failure of the defendant County

and the NCPD to properly supervise and train police officers in the Mounted Unit with

regard to crowd control techniques.

143.    Defendant County knew or should have known that the acts alleged herein would deprive

plaintiff of his rights, in violation of the First, Fourth, Fifth and Fourteenth Amendments

to the United States Constitution and Article 1, §§ 6, 8, 11, and 12 of the Constitution of

the State of New York.

144.    The defendant County is directly liable and responsible for the acts of the individual

police defendants because it repeatedly and knowingly failed to properly supervise, train,

and instruct them to require compliance with the constitutions and laws of the State of

New York and the United States.

## FIFTH CAUSE OF ACTION

(New York State Constitutional Violations)

145.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing

paragraphs as if fully set forth herein.

146.    Such conduct breached the protections guaranteed to plaintiff by the New York State

Constitution, Article I, §§ 6, 8, 11, and 12, including his rights of:

a.      freedom to engage in protected speech;

b.      freedom of assembly;

c.      freedom of association;

d.      freedom to petition for redress of grievances;

e.      freedom from unreasonable seizure of his person, including excessive force;

f.      freedom from arrest without probable cause;

g.  freedom from false imprisonment, that being wrongful detention without good faith, reasonable suspicion or legal justification, and of which wrongful detention plaintiff was aware and to which plaintiff did not consent;

h.  freedom from abuse of process; and

i.  freedom from deprivation of liberty without due process of law.

147.  Defendants' deprivation of plaintiff's rights under the New York State Constitution resulted in the injuries and damages set forth above.

## SIXTH CAUSE OF ACTION

### (False Arrest)

148.  Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

149.  Acting under color of law, defendants O'Leary, Kelly, Pandolfo, Maher, Carbon and John Does unlawfully caused, ordered, approved and/or knowingly arrested and/or seized without probable cause or other legal justification.

150.  The individual defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights, resulting in the injuries and damages set forth above, and are therefore liable for punitive damages.

## SEVENTH CAUSE OF ACTION

### (False Imprisonment)

151.  Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

152.  Acting under color of law, defendants O'Leary, Maher, Carbon, Pandolfo and Kelly unlawfully caused, ordered, approved and/or knowingly failed to prevent plaintiff's

wrongful detention, thereby depriving him of his liberty without good faith, reasonable suspicion or other legal justification.

153.    For almost all of the relevant time, plaintiff was conscious of his confinement, and at all relevant times, plaintiff did not consent to his confinement.

154.    The individual defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights, resulting in the injuries and damages set forth above, and are therefore liable for punitive damages.

## EIGHTH CAUSE OF ACTION

### (Assault and Battery)

155.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

156.    On information and belief, defendants Quagliano, Carbon and/or John Does without just cause, willfully and maliciously touched plaintiff without plaintiff's authorization and used physical force on plaintiff, causing plaintiff to suffer physical and emotional injuries.

157.    Defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights and are therefore liable for punitive damages.

## NINTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

### (against Quagliano, Pandolfo and Nassau County)

158.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

159.    Defendants by their aforementioned acts, did intentionally, willfully, and knowingly

cause plaintiff to suffer mental and emotional distress, pain and suffering, and damage to name and reputation.

160.   Defendants committed the foregoing acts intentionally, willfully and with malicious disregard for plaintiff's rights and are therefore liable for punitive damages.

## TENTH CAUSE OF ACTION

### (Negligence)

161.   Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs if fully set forth herein.

162.   The individual defendants, by their aforementioned acts, negligently failed to use due care in the performance of their duties in that they, among other negligent acts:

   a.   Failed to perform their duties as a reasonably prudent and careful police officer or supervisor would have done under similar circumstances; and/or

   b.   Carelessly and recklessly used force against plaintiff and seized and detained plaintiff without a warrant or probable cause; and/or

   c.   Carelessly and recklessly failed to intervene in the unlawful actions taken against plaintiff resulting in his injury, unlawful arrest, detention and prosecution.

163.   The negligent actions of the individual defendants directly and proximately cause plaintiff's injuries and damages set forth above.

## ELEVENTH CAUSE OF ACTiON

### (Respondeat Superior Against Nassau County)

164.   Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs if fully set forth herein.

165.   Defendant County is liable for the actions of the individual defendants under the doctrine of <u>respondeat superior</u>.

## **JURY DEMAND**

166.   Plaintiff demands trial by jury in this action.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all defendants:

a.   a declaration that defendants violated plaintiff's federal and state civil rights;

b.   a declaratory judgment that the use of horses by NCPD police officers against demonstrators as a means of crowd control when no emergency or exigent circumstances exist is unconstitutional as a matter of law;

c.   compensatory damages for the injuries suffered by plaintiff by reason of defendants' unlawful and unjustified conduct, in an amount just and reasonable and in conformity with the evidence at trial in an amount not less than $75,000;

d.   punitive damages against the individual defendants assessed to deter such intentional and reckless deviations from well-settled constitutional standards to the extent allowable by law;

e.   attorneys' fees;

f.   the costs and disbursements of this action;

g.   interest; and

h.     such other and further relief as appears just and proper.

Dated:  New York, New York
        April 19, 2011

_____
Jonathan C. Moore (jmoore@blhny.com)
Vera M. Scanlon (vscanlon@blhny.com)

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0400

*Attorneys for the Plaintiff*

To:    JOHN CIAMPOLI
       Nassau County Attorney
       Attn.: Andrew Scott
       One West Street
       Mineola, New York 11501